We have one case this morning. It's number 33-1247. Vanda Pharmaceuticals Inc. v. Teva Pharmaceuticals Inc., Mr. Groombridge. Thank you, Your Honor, and may it please the Court. I believe I have reserved two minutes for rebuttal. I would like to begin with the reissue 604 patent and talk about the errors that we believe compel reversal here. And to begin, I'd like to make clear that what we see here are pervasive errors of law, which in turn led to errors of fact. And the errors of law are the failure to consider the prior art as a whole and instead to use the claimed invention as a template from which to stitch together elements of the prior art in violation of the clear direction this Court has given going all the way back to the Penduit case. And I would begin with the key part of the claim of the 604 patent. The question there is whether 20 milligrams of Tazamelteon, administered as claimed, can entrain a patient. And I believe some aspects of this are common ground. What entrainment means is synchronizing the patient's natural circadian rhythm, which varies, one might think of it like a sine curve, synchronizing it to the rhythm of the sun, of the earth. And I believe it is common ground that at least one thing that is required in order for that synchronization is for the drug to be able to do what is called phase shifting. So just to try to move this along, if I understand your argument correctly, you're saying that the prior art references don't show a statistically significant effect on phase shifting, though they do show an effect on other aspects of sleep disorders, correct? Absolutely correct, Judge Dyer. And on the cross-examination, the generics expert on which the district court relied heavily conceded that. But he also said that there were, even though it wasn't statistically significant, there were other aspects of those prior large studies that led him to conclude that it would have an effect on phase shifting. And there was no further cross-examination about that. So why isn't that sufficient for the district court to conclude that these prior art studies suggested something about the 20 mg dose and phase shifting? Is my statement a fair summary of what happened? I think your statement is a fair summary of what happened, Your Honor. And I think if we dive into that and we look at it, the expert said at some point in his testimony yes, there is a place in which in the so-called Roger Atnam prior art it shows a one-hour phase shift at the 20 mg dose. But the Roger Atnam reference makes clear that that's not statistically significant. In other words, their witness agreed with that. Right, and he agreed with that. And he also agreed that in the Hardeland reference, which underpins a lot of the obviousness holding, that when Hardeland was talking about the use of 20 mg to 50 mg, that was not for phase shifting. And that's in the record of 19303. And so in our view, Your Honor, if we step back and look at the art and we say what does it show, right, what would be a fair reading of this body of art if you were a skilled person in 2012? You would find one primary reference and three secondary references, which in essence repackage. But the witness said that nonetheless, despite a lack of statistical significance, there was data in there which led him to conclude that it was likely that there would be a phase effect from the 20 mg study. I think he conceded, and this is at 19302, that in the primary reference, it was the only dose that showed statistically significant phase shift and was 100 mg. Yeah, he conceded that. But he also went on to say, nonetheless, I concluded that this prior art shows that it would have an effect. I think the only thing he pointed to was the 20 mg result in the Roger Atnam reference, which on the face of the reference is not statistically significant. And Roger Atnam itself says that. In other words, what I would suggest, a witness, credible or not, can't override the express teachings of the prior art. Well, I don't think it's an express teaching. He says, this is one example on 19304. He says, I think we do have some evidence to suggest that a lower dose is at work. He says lower than 100, but he doesn't say that. The only thing that he points to with respect to 20 is the bar chart in Roger Atnam, which on its face, and I believe everyone, including he, agreed is not statistically significant. So there is, for example, a kind of passing statement in the Vanda 244 reference that 50 mg might work to phase shift. So you can find something in the record that says, well, maybe less than 100. But what you can't find is any, viewing the art as a whole, you cannot find anything that would say 20 mg will work to phase shift. And he also said, and I'm happy to engage further with that if the court wishes to, or I can move on. But he also said that phase shifting is a necessary but not sufficient condition to accomplish entrainment. And the district court's opinion entirely skips over that and proceeds from the assumption that all one needs is phase shifting. And Emmons indeed conceded that, and this is at 19298, that a drug could phase shift and yet be unable to entrain. And that, too, is something that the district court completely failed to engage with. And in our view, Your Honor, that's what's underlying this is a failure to consider the differences from what was in the prior art and looking merely at the similarities. And so this ability, there was a lot of testimony about a phenomenon that Dr. Emmons himself named called spillover, in which, and what's going on here is the drug, when one admits this, has to be able to pull the circadian rhythm into alignment. But if the drug persists in the patient's body for too long, it will then pull back and pull the rhythm out of alignment. And that, it will undo the very thing that it was supposed, that it was administered to do. And that, whether it does that depends upon the amount given, the time it's given, and the characteristics of the drug, how quickly it's cleared out of the body. And the, and here what we've got, the district court said, well, tazomelton works just like melatonin. But the unequivocal evidence in the record here is that the half-life of melatonin is, let's say 30 minutes, might gust to 45 minutes, whereas the half-life of tazomelton is two hours. And so those things, what they're saying there to the skilled person is that there's no way to predict whether it would, in fact, do this, whether it, even if it can phase shift at this dosage, no way to know whether it will still persist in the body and make it impossible to accomplish the entrainment that is part of the claim. The district court simply failed to engage with any of that and said, Judge Breisman. No, no, go ahead. And repeatedly through the district court opinion are statements that phase shifting, equating phase shifting with ability to entrain. In derogation of the admission on cross-examination by Dr. Emmons, that phase shifting is necessary but not sufficient, and something, even that which phase shifts, may not be capable of entraining. District court simply didn't engage with that because it didn't address the differences between melatonin and tazomelton which bear critically on that issue. Could you turn to the food patent? Absolutely, Your Honor. Yes. And would you agree that testing for food effects is a very common procedure to employ in the process of getting FDA approval for drugs? I believe it is, Your Honor, although I'm not sure whether that's reflected in the record here. But I certainly think it's not uncommon. Yeah, it is reflected in the record because there's an exhibit, maybe it's 345 is the number, which talks about your 100 milligram food effect study, and it recognizes that the FDA suggests testing for food effects. That's certainly right, and that study is a study that was done in accordance with, I think, fairly typical FDA procedures. But the effects of that are not public. So, I mean, I think what we boil down to here is, you know, what I take the district courts who have said is, well, it's a binary choice, and so both either doing it with food or doing it without food are obvious. And what we would say, Dr. Emmons testified here, and this is in the record at 19292, that the only way you could know whether there would be a food effect that would bear on the efficacy of Tazomelteon would be to do such a study. Sure, but doesn't the FDA suggest that you do such a study? And isn't that sufficient to point you in that direction? I think, Your Honor, my answer would be, regardless of whether the FDA suggests it, it's not sufficient. The question is whether in the prior art, is there a teaching that this drug would have this effect? In other words, some drugs do, some drugs don't. There has to be a teaching, a specific teaching with respect to the drug in question? I think there has to be a specific teaching that the invention would have been obvious. And if you simply don't know, right, if the art is silent, and it could be that it matters, it could be that it doesn't matter, it could be that it matters with some kinds of food but not other kinds of food, which is, you know, can happen, then there's no way to predict that. And accordingly, simply because the choice is... It's obvious to try. It tells you this is something that's a matter of significance and you should look at it. But, you know, typically we don't... And a finite number of possibilities. I'm not sure that there are a finite number of possibilities. In other words, the question here is whether and to what degree does food affect the ingestion of this drug into the bloodstream? And that doesn't seem... In our view, that's not something as to which there are a finite number of answers. It might, it might not. It might to some degree, a greater or lesser degree. Whether that it does to such a degree that it's important enough for FDA to say, I require you as part of the labeling to tell patients not to take it with food is not in our view a binary choice. You could only know that by having investigated it. And in this case, you know, it could be that there is a modest effect, but it doesn't matter. And so, you know, it could be that it increases the efficacy to some degree, but that doesn't matter either. The fact that it is significant enough here in the context of this treatment, which comes back again in our view to the need to have a, what we have termed in the briefing, a short, sharp pulse of the drug, which is related to entrainment. It needs to get in there, do its job, and then get out, right? That was not knowable in advance. And the discovery that in order to accomplish that and make the treatment effective, it must be done without food is inventive. It's not known. There's nothing in the art that points to it. And with that, cognizant that my time is running out, I would turn to the so-called 3A4 patent, unless any of your honors have further questions. So on 3A4, in our view, again, what we have here is a failure to consider the prior art as a whole. The district court acknowledged, and this is its finding of fact 88, that FDA requires in vitro testing of the metabolism of drugs, which, and the reason that the district court held that was that for the other drug-drug interaction patent, the district court said, and that is what the starting point in an obviousness analysis. But for the 3A4 patent, the district court ignored this unequivocal teaching in the prior art from the so-called Vashrajani reference, that this enzyme was not involved in the metabolism of tezomeltion. Now, Vander subsequently discovered that that teaching was wrong, just flat-out wrong. But here, you know, in our view, if one is sitting down to conduct an obviousness analysis in 2012, manifestly the starting point has to be with the single most direct teaching in the art. Is the enzyme CYP3A4 involved in the metabolism of this drug? There's a clear and unequivocal teaching that the answer to that question was no. And... It's an in-vitro test. It's absolutely an in-vitro test. Well, but that... Go ahead. But, Your Honor, the... It's made by your opposing counsel, and that isn't particularly telling, given the inducement factor. Well, but at the same time, the district court, and indeed my learned adversary, say that for the 1A2 patent, it's completely telling. The in-vitro testing answers the question, right? And what we would say here is FDA's procedure, as laid out, is one begins with the in-vitro testing. If the in-vitro testing shows there's no need to be concerned, very often one doesn't go any further. And here, by contrast, the obviousness analysis is let's ignore that. Let's start and go through some convoluted analysis to get to using an entirely different drug and say, okay, there's a problem. And then only then come back and say, you know what? The in-vitro testing doesn't exclude the possibility that it might be wrong. Okay, but it's a convoluted path, as you characterize it. And the district court accepted and made findings about it, right? It made findings about, and again, Your Honor, we would say that those findings are very hindsight-driven and that they ignore clear teachings in the art of differences between the molecule at issue in that analysis, remeltion, and tazemeltion. And so, for example, if we look at the Hardeland reference, which figures prominently in the obviousness analysis, it says, and this is at 20525, it calls out differences in the metabolism between tazemeltion and remeltion. It says that there's a metabolite that shows up from remeltion that doesn't exist with tazemeltion, teaching that they're not the same pathways. So, again, if we go back in time and say, I'm sitting down in 2012 looking at the array of relevant information that's in front of me, we would suggest that, as an obviousness, as a conclusion of law, we can't get to the place that the district court arrived to. And I'll just, I recognize my time is finished, but the one final point I would make there is that also in the record, this comes back to questions of half-life, right? The record is scattered through the record that the half-life of tazemeltion is approximately two hours, and the effective half-life of remeltion is five hours. And what that bespeaks is a radical difference in how the two operate in the body. And so if one's going to posit, okay, I will begin with remeltion, ostensibly because of its similarities, I should also look at the differences, as it seems those differences are playing a major role here. And instead, the district court merely looked at the similarities and disregarded the differences. If we do that, you know, if we only consider one half of the ledger, that is going to put the thumb on the scale in such a, I'm mixing my metaphors, but in such a severe fashion that the outcome is simply wrong. Okay, I think we're about out of time here. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Rosenthal. May it please the Court. I prepared to address the validity issues in this appeal, and my colleague, Mr. Lucas, is prepared to address the infringement issue. I didn't hear that we got to the infringement issue, and so I'm not sure that there will be much to say there. But the trial of this case was a classic battle of the experts, and Vanda lost it fair and square. On each of the patents, the experts had competing narratives about what people of skill in the art at the pertinent time would have understood, and in each instance, the district court credited Teva's and Aphitex's experts and declined to credit the testimony of Vanda's experts. So what Vanda now tries to categorize as essentially hindsight, they say, well, there's no way that you could have arrived at these results without looking at our invention. They're simply just not liking the version of the facts that the district court ended up crediting that was presented by the experts on our side. And the resulting factual determinations are very well supported in the record. By the time of the January 2012 priority date for the RE604 patent, there was a well-developed body of tazimeltion prior art discussing the treatment of totally blind, non-24 patients by administering 20 milligrams of tazimeltion once daily before bedtime. The prior art discussed the structural and functional similarities between tazimeltion and melatonin, which had been shown to entrain circadian rhythms, and predicted that the tazimeltion treatment protocol now claimed in the patents in suit would be useful in treating non-24. For example, the Hardeland reference stated not only that the drug may be useful in the treatment of sleep disturbances related to circadian rhythm sleep disorders or other types of entrainment difficulties, but also said that these properties are expected from a melatonergic drug, which is to say a drug that acts on the melatonin receptors in the brain. While we're on this patent, I'd like to go ahead and address the 20 milligram point that was discussed. So there was one major Phase II study that was done that was the subject of an awful lot of testimony at trial. It was a study of essentially jet lag. So there were 39, it was a small study, there were 39 participants. They were divided into multiple groups of placebo, 10 milligrams, 20 milligrams, 50 milligrams, 100 milligrams. And so each group had only a small number of participants. There were between six and eight people per group. And the phase shift that was attempted was a five-hour phase shift, which was supposed to mimic essentially the difference in time between London and New York or Washington. And what the results showed was that at the 100 milligram dose, there was a statistically significant phase shift of between two and three hours in the relevant population. There were smaller shifts at the other doses, but because there was a very large, a very small placebo group and a very wide variance in the results of that group, the standard deviation was extremely large for the placebo group. And so although it looked like the placebo ended up with about a half an hour phase shift and the 20 milligram dose ended up with about an hour phase shift, when the numbers were crunched, there was not a statistically significant difference between those results. But there was a statistically significant finding that there was a dose relationship between the phase shifting and the amount of the drug administered. And so I think the best thing to, the best way to understand what people in the ART understood from that study at the time is to see what they said about it at the time. So the Roger Rotnam reference itself says, although there was a dose response relation, and it says the P value was .008 by a Spearman rank correlation, only Tazimelteon 100 milligrams shifted DLMO, which is to say dim light melatonin onset, significantly earlier than did placebo. And the court can find that and the famous bar graph that we've all been talking about at appendix 26064 to 65. So then when the other prior ART references are talking about this result, what do they say? Well, Hardelin says that this dim light melatonin onset is a suitable measure of the circadian phase. It indicated a dose dependent response, and it gives the P value again, P.008. However, a significant phase shift was demonstrated only at 100 milligram dose. That can be found at appendix 2528. So, and then the 244 publication, Banda's own prior publication, again, discusses the same results and says that it shifted DLMO on the first night of treatment when compared to baseline in a dose dependent manner, and it actually reports the data in table 11.1.1, which can be found at appendix 20621 and 20622. So people in the ART at the time knew that 100 milligrams would give you a two to three hour shift, and that the shift would be dose dependent, so a smaller dose would give you a smaller shift. And the testimony of trial was that because this is a condition, non-24, in which people's circadian rhythms are out of sync by half an hour to an hour, you're going to want to have a phase shift of half an hour to an hour in order to treat. And therefore, as Dr. Emmons explained, something less than 100 milligrams would be needed, because 100 milligrams and a three hour phase shift would be too much for what was being treated. And so we know that a smaller dose is what was needed, and it's remarkable that Vanda itself in the 244 publication, after describing this data, said that 20 to 50 milligrams is the most effective dose and actually wrote claims to 20 to 50 milligrams used to treat circadian rhythm sleep disorders half an hour before bedtime. So if you were taught away from 20 milligrams, you would never do anything less than 100. The fact that at the time they reported the data and then sought to get claims at 20 milligrams is the better indication of what people in the prior art understood. Could you talk about the food patent? Certainly. So the food patent, I think what's noteworthy about the food patent is it literally just says take with food. It doesn't say take with food and get a better pharmacokinetic profile. Sorry, without food. Pardon me. Pardon me. It says take without food. It doesn't say take without food and get a more effective drug. It doesn't say take without food and get a safer drug. It doesn't say take without food and get a more convenient drug. All it says is take without food. The specification indicates that this was expected, at least according to the applicant, to produce a superior result. Well, there's no evidence in the record that I'm aware of that it does in fact lead to a superior result. In terms of what the specification was indicating about the condition of not taking food, the specification seems pretty clearly to say we have a higher maximum and a quicker total of the drug presence in the plasma, right? Yeah. So this notion of... is something that surfaced in this case on the first day of trial. And the only person who espoused it was Dr. Polymeropoulos, who is the named inventor on the patent. So it's not something that came up in the expert reports. It's not something that you're going to find in the prior art as being relevant to efficacy. And in fact, in the post-trial briefing, some articles were cited suggesting that maybe it would be better with food rather than without food. So what? Right. Well, yes, thank you. So in any event, we have a situation where, as the court pointed out, the FDA instructs people or recommends that people do these food effects studies. Here, a study was done, and the resulting claim... We know that in the prior art, this drug was administered typically right before bedtime. Indisputably, some people had some food. Most people didn't have food. If we credit their expert, Dr. Seisler, four out of five people didn't have food, and one out of five did. And the claim says, in substance, do it the way most people have been doing it in the prior art. And so sort of without getting... without even reaching the question of whether it's obvious to try or whether the FDA said it, to say, do it the way we've always been doing it, seems to me to be the epitome of obviousness. But in any event, it certainly is the case that to do things with food or without... to test with or without food is an absolutely standard thing, and I think the district court was correct to perceive that. Suppose that you had a case in which there was a drug that could be either taken in a capsule form or in a chewable tablet form. And it turns out that 80% of the people took it in capsule form and 20% in a chewable tablet form. And sure enough, there were a lot of failures, someone discovered, among the chewable tablet form, and almost no failures in the capsule form, so they sought a patent to limit the way the drug was administered to capsules. You think that's not patentable? Well, I think... I mean, the discovery itself is presumably quite useful to stop people from using the chewable because they have a very low success rate. So I just want to be sure I understand the hypothetical. So you have a hypothetical where most people take capsules, some people take tablets, and it turns... And the tablets don't work. It turns out that the tablets are worthless. Right. So again, I think when we have a situation where someone discovers a problem that was not previously appreciated, and I mean, I think that one of the key differences between Your Honor's hypothetical and what we have here is that of course, it's absolutely routine that some drugs work better with food, some work better without food, some it doesn't make a big difference, and to try with and without food is sort of a standard thing to do in the course of drug development. I don't think there's a similar impetus when one has two competing dosage forms like a tablet and a capsule to expect the same sort of difference in outcome. Does this answer the question as to whether for purposes of obviousness to try that there is an identifiable problem? Are you saying in effect that any time you have a food, no food question, that problem is present with respect to drugs and the capsule? Yeah, I think that's a fair way. I think that's a fair way of putting it, Your Honor. Yes, I think that's a fair way of stating it. Before you sit down, just one other question. The Tazmeltion patent on the compound itself expired in December, if I recall correctly. Yes, Your Honor. What is the launch situation? So currently, Teva has a product on the market, and I believe at the moment that that is the only generic that is on the market. That's because of the 180-day exclusivity? Well, so there was shared exclusivity in this product with Apotex, Teva, and at least one other company, although that third company has some sort of agreement with Vanda. We don't know exactly what the contents of the agreement are. So at least in principle for the 180 days, it would be possible for Apotex and possibly this third product to be on the market. But as far as I know, that has not yet happened. One more practical question, I guess not really legal. If any one of these four patents is sustained, and setting aside the infringement issue for present, would that have the same effect? Setting aside the expiration dates vary a little bit. Would it have the effect of keeping the generics off the market if any one of these four? I don't think so, Your Honor, because there are unresolved questions of infringement for some of the patents, right? So in other words, if the district court for at least the drug-drug interaction patents declined to reach the question of infringement because he perceived it to be unnecessary. Presumably, for example, the food patent for which the Andes are presently food. For the food patent, the parties have stipulated to infringement. So in that case, if that were to be found valid or not invalid, then that would... That would be enough in and of itself to keep the generics off the market. That would suffice. May it please the Court, I just have a few brief remarks. On your last question, Judge Bryson, on the food patent, there was also an unresolved issue of written description, a 112 issue, because the food patent dealt with healthy volunteers. And so the Court elected to go with obviousness and set aside the 112 argument that the defendants made at the district court. But I believe that... The study in the food patent was healthy volunteers? It was, Your Honor. So that would require a remand back to decide the 112 issue based on a finding of validity based on non-obviousness. With respect to infringement, I just wanted to address one issue that came up in the reply brief from Vanda. In his reply brief at pages 19 to 20, Vanda argued for the first time that there was legal error and factual error based on a failure of the district court to consider these clinical practice guidelines for treating 924. And that's in the record of 24454 through 9-1. In short, these arguments were never presented to the district court. So that document, the guidelines, were only offered into evidence through Vanda's invalidity rebuttal expert. And that's at 19314 to 15. And his testimony concerned their disclosure of prior clinical studies that involved melatonin. Vanda only cited those guidelines in their post-trial briefing with regard to secondary indicia of non-obviousness. And as this court held in Ray Google Technologies, these arguments were not made below, and therefore should be viewed as forfeited. And with respect to the inducement claim in its entirety, I would submit that the district court's findings are supported by substantial evidence, and a lot of those findings were based on witness credibility. And for that reason, I believe this court should affirm. Thank you, Your Honor. Just to pick up where we left off, one of the things that we were frankly surprised by in the red brief is a concession that when you look at the clinical studies, there were two clinical studies, one that first sought to entrain, called SET, and one that then discontinued that treatment called RESET. And after many years of litigation, there was a concession that at least some of the patients who came out of the first study were entrained. And to us, that pretty much wraps up the inducement question, because those two studies are both referenced in the labels. And so to the question of does the label encourage, recommend, or promote usage in a way that would entrain, I think now given that the generic labels include the SET study, it would seem that there frankly couldn't be much debate about it now. The other point I would like to make is that Mr. Rosendahl said that as of the priority date, there was a well-developed body of prior art with respect to the use of Tazimeldean to treat non-24s. Non-24, we do not think that is correct. The only disclosures of Tazimeldean to treat this disease condition, non-24, are the Lankford reference, which says no more than that a clinical trial is underway, and Vander's own report or disclosure on clinicaltrials.gov that again says a trial is underway. All of the rest of the prior art dealt with other circadian rhythm sleep disorders, not non-24. And one of the key problems that we see in the district court opinion is a constant blurring, just sort of a sweep of the hand to say anything that relates to a circadian rhythm sleep disorder equals non-24, and that's just not correct. There are many circadian rhythm sleep disorders. A lot of these drugs were used to treat insomnia, for example, or attempted to be used to treat insomnia. It has nothing to do with entrainment, and so there is no showing in the art that Tazimeldean would have been effective for this disease condition because that only happened when the clinical trial results were unveiled, and that's not prior art. And with that, your honors, my time is up, and I thank the court.